## SOUTHWESTERN DRUG CORPORATION v. FIRST NAT. BANK et al.

### No. 3694.

Court of Civil Appeals of Texas. Amarillo.

Jan. 6, 1932.

Rehearing Denied Jan. 27, 1932.

James O. Cade, of Amarillo, for appellant.

Madden, Adkins, Pipkin & Keffer and Hugh L. Umphres, all of Amarillo, for appellees.

HALL, C. J.

This suit was instituted by the Southwestern Drug Corporation against F. R. Brown, as owner of the Rule Building Drug Store, and against the appellee bank and L. G. Palmer.

The plaintiff sought to recover against the Austin Drug Company No. 2 upon certain notes dated Nov. 4, 1929, and to foreclose a chattel mortgage given by the Austin Drug Company to plaintiff on the same day. Plaintiff alleged that the Austin Drug Company had executed a chattel mortgage to the First National Bank, dated May 8, 1929, which had been duly filed for registration prior to the execution of the mortgage given to it, but alleged that the mortgage to the First National Bank was void: First, because it described a note for $3,500 and that no such note was given, and that, on account of the misdescription of the indebtedness, the mortgage was null and void; and, second, because the mortgage upon the Austin Drug Company's property was given to secure the personal indebtedness of L. G. Palmer, its president, and was therefore not enforceable against the property of the corporation.

The bank filed a first amended original answer, consisting of a general demurrer and general denial, and in addition thereto sought to recover upon its note and foreclose its mortgage against the Austin Drug Company, alleging that the note intended to be secured by the mortgage was described therein as a note for $3,500 by mistake. That the note actually secured was one for $2,500, which was in all other respects similar to the note described in its chattel mortgage, and pleaded that its mortgage was prior and superior to the mortgage sought to be foreclosed by plaintiff.

A jury was impaneled to try the case, but upon the conclusion of the testimony the court directed a verdict in favor of plaintiff, and for the foreclosure of its chattel mortgage lien, but decreed that such lien was in all things inferior to the lien of the First National Bank, and that the foreclosure should be subject to all of the superior rights of the bank.

The case is submitted here upon two propositions.

By the first proposition it is insisted that the court erred in directing a verdict for the bank and in refusing to direct a verdict for plaintiff, because the testimony of the witness and codefendant Palmer clearly was that the mortgage dated May 8, 1929, signed by Austin Drug Company No. 2, was given to secure a $3,500 note, as is recited by the mortgage, and the note which was introduced in evidence as the Defendant's Exhibit A was a $2,500 note, and there is no evidence either in the wording of said note or other extrinsic sources that said note was a chattel mortgage note, or that it had ever been secured by the mortgage dated May 8, 1929, or by any other mortgage, and that for that reason there was a fatal defect in the description of said note in the mortgage, and that there was no way that the court could construe said $2,500 note and said $3,500 mortgage together, and there was no proper description of a $2,500 indebtedness in said mortgage, and further, because plaintiff's mortgage dated November 4, 1929, was not challenged or questioned in any way in the pleadings or evidence and should have been foreclosed by the court.

By the second proposition the appellant insists that the court should have given plaintiff's special requested issue No. 3, submitting the questions as to whether or not the note for $2,500, signed by Austin Drug Company No. 2, was ever intended to be secured by the mortgage dated May 8, 1929, because there is a serious conflict in the evidence, in that L. G. Palmer, one of the defendants, testified that the only note which he ever signed in connection with the mortgage dated May 8, 1929, was a $3,500 note, while the note introduced in evidence by the defendant bank as Exhibit A was a $2,500 note, and there was no evidence that it had ever been a $3,500

note, which presented a question of fact as to whether or not the $2,500 note was the one which was intended to be secured by the mortgage of May 8, 1929.

The $2,500 note was introduced in evidence by the bank without objection. When reduced to their final analysis, the appellant's contentions amount to this: That the misdescription of the debt secured in the mortgage rendered the mortgage void as against the mortgage subsequently executed to the Southwestern Drug Corporation.

As said in 11 C. J. 475, § 107:

"The weight of authority is that a misdescription in the mortgage of the nature of the debt is not necessarily fatal and a clerical inaccuracy which does not in fact mislead may be disregarded. * * * In a proper case, however, the mortgagee may have the instrument reformed in a court of equity if no rights are thereby cut off. The fact that a renewal note has been given is sufficient to account for a misdescription of the debt secured by mortgage."

The rule last announced in the text is supported by Barrows v. Turner, 50 Me. 127; Clark v. Houghton, 12 Gray (Mass.) 38.

It is held in Bailey v. Culver (Tex. Civ. App.) 175 S. W. 1083, 1084:

"But if such misdescription had been material, equity, upon a proper showing of mutual mistake, would have reformed and enforced the mortgage, and the evidence in this case was sufficient to justify such reformation. However, we deem the error as to describing the debt immaterial, for the reason that it was the debt, and not the note, that was secured by the mortgage. Aycock v. Trammell, 77 Tex. 487, 14 S. W. 147; Meyer Bros. v. Rather [Tex. Civ. App.] 30 S. W. 812; Simon v. Ash [1 Tex. Civ. App. 202], 20 S. W. 719.

"In Meyer Bros. v. Rather, supra, the court quotes with approval from Cobby on Chattel Mortgages, as follows:

" 'The validity of a mortgage depends on the genuineness of the debt which the mortgage is to secure, and not upon the description of the debt contained in the mortgage. * * * A misdescription of the note given as evidence of the debt, in the chattel mortgage securing the same, is not a fatal error, and does not avoid the mortgage.' "

It is further stated in 1st Cobby on Chattel Mortgages, § 120:

"It is enough if the note be so far described [in the mortgage] that it appears with reasonable certainty to be the note intended to be secured thereby. * * * Clerical inaccuracies in the description of the debt will not invalidate the lien as against the mortgagor or his subsequent judgment creditors, if the debt be unmistakably identified. * * * Where there is a discrepancy between the instrument described in the mortgage and the

one actually given as evidence of the debt, but it is established that the instrument offered in evidence is the one intended to be described in the mortgage, the courts have been liberal in admitting it. Thus where a note was described in the mortgage as being for $236.00 but when offered in evidence it appeared to be for $256.00 but corresponded in other respects with the description, held, that it was admissible."

The rule with reference to this matter, as announced in relation to chattel mortgages, obtains even in real estate transactions.

Quoting from 1 Jones on Mortgages (8th Ed.), we find this language:

"Although a mortgage be given for a definite sum, it is competent to prove by parol that it was given to secure an open account, the balance of which is continually varying or to secure payment to be made in materials under a prior agreement between the parties. Section 428.

"A mortgage given for a greater sum than the amount due without fraudulent intent, is valid to the extent of the actual debt. In such case the mortgagor may show that the lien was for a less sum." Section 430.

"While a mortgage may modify the contract, an irreconcilable contradiction by the mortgage of the terms of the notes can not be allowed to affect the contract as shown by the notes. The indebtedness is represented by the notes which constitute the primary contract. When a note agrees in some respects with the description, but varies in others, it may be proved by parol to be the one intended in the mortgage." Section 432.

"Where a mortgage described a bond secured by it, as of a certain sum, a bond for a smaller sum and dated one day later may be shown in evidence to have been substituted for the bond described and in an action to foreclose, judgment may be rendered for the amount of the latter bond. * * * Where the note and mortgage are at variance in some particulars, it has been held that the terms of the note shall govern, inasmuch as the note is the principal obligation and the mortgage merely an incident thereto." Section 433.

The weight of the authority is to the effect that parol evidence is admissible to identify a note which has been misdescribed in the mortgage and show that the note produced is the one referred to in the mortgage. Sections 434, 450, and 468.

We think the uncontradicted testimony in this case identifies the $2,500 note as the one intended to be secured by the mortgage, and that the misdescription of the note in the mortgage, wherein it is described as a note for $3,500, is fully explained by the fact showing that it was a renewal of a former note for $3,500.

H. E. Fuqua, the vice president of the First National Bank, testified that he handled the transaction with Palmer which resulted in the note and the mortgage on May 8, 1929, and he says that he did not receive a note for $3,500. It appears from the testimony of Palmer that he had previously executed a note for $3,500 and a mortgage securing same, but that when he undertook to sell the drug store known as Austin Drug No. 2, his creditors required that he reduce the $3,500 note to the First National Bank to the extent of $1,000. That he drew $1,000 from his private funds deposited in a different bank, and he seems to be confused and was not certain whether the $1,000 was credited on the $3,500 note, or whether the original note was for $3,000 and was credited with $500, but he does state that he signed and indorsed the note sued on, which was the only note the Austin Drug Company then owed the bank. It appears that P. R. Underwood was appointed assignee for the benefit of the creditors of the Austin Drug No. 2 after Palmer had transferred the business to Brown. As assignee, he says he acquainted himself with the affairs of the business and knew that the mortgage was in existence and the approximate amount of it. Further testifying, he said: "The amount of that mortgage as I recall was $2500.00. I think the note was originally $3500.00, with $1,000.00 credit or it was $3,000.00 with $500.00 credit. At the time the sale was made to F. R. Brown, I had discussed the consideration that Brown was giving for the property, with Mr. West."

West was appellant's credit manager and was looking after the collection of appellant's claims against this and other drug stores.

Underwood further testified: "We talked about that the bank's debt at the time we first began to talk to Mr. Brown, would run around $2750.00 to $2800.00, and that the Southwestern Drug Company's mortgage would be, well, approximately the same amount as I remember it now." This testimony is uncontradicted and shows that the plaintiff's credit man West was thoroughly familiar with the amount which the Austin Drug No. 2 owed the bank. Underwood further stated, in detailing his conversations with West: "Our discussion with reference to the First National Bank's debt was that the debt was a first lien on the fixtures and it would be approximately $2750.00 to $2800.00."

Palmer was president of Austin Drug No. 2 and owned all of the stock except two shares. It appears that he handled the business practically as if it were his own, and, while he seems to be confused in some of his statements, there is no inconsistency in so far as his testimony identifies the $2,500 note as the one intended to be described in the chattel mortgage. It appears that at the time he first acquired the drug store it became necessary for him to secure money to pay in-

debtedness then outstanding against it, and he borrowed $3,500 from the First National Bank, giving his personal note for this loan. This money was deposited to his individual credit and checked out in his own name. He testified: "The corporation could not borrow the money from the bank. I had to borrow it on my personal name to run the store. The best I can explain to you is this way: the corporation was not known to the First National Bank and I had to borrow this money on my personal name for they would not loan it to the Austin Drug, Inc. My name borrowed the money for the company. This loan was made to me personally and I gave a mortgage on Austin Drug No. Two fixtures to secure the loan." He testified that just prior to the time he sold his interest in the business he was required, under his contract with his purchasers, to pay $1,000 on the $3,500 note, and that he drew $1,000 out of his personal account at another bank to make the payment, and then he says: "That payment of $1,000.00 was made after the mortgage was given, I believe. In other words, that payment reduced the $3500.00 note to $2500.00. I just had one note, just one principal note." He then identified the $2,500 note which was handed to him, and which he had indorsed, and which was Defendant's Exhibit A.

■ No one testified, nor can it be inferred from the record, that the bank now holds a $3,500 note in addition to the one sued on. If the $2,500 note, which forms the basis of the suit and was introduced without objection, is the only indebtedness which the Austin Drug, as represented by Palmer, owed the bank on May 8th, then it is clear that it was misdescribed in the mortgage and, there being no evidence to the contrary, the court did not err in directing a verdict.

The judgment is therefore affirmed.